United States District Court
Southern District of Texas
ENTERED

FEB 2 4 2000

Michael N. Milby, Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

9.

| | | |
|---|---|---|
| T.H.E. INSURANCE COMPANY | § | |
| | § | |
| V. | § | C.A. NO. C-00-023 |
| | § | |
| WAGNER'S CARNIVAL, ALBERT WAYNE | § | |
| WAGNER, DENISE HALEY WAGNER, | § | |
| INDIVIDUALLY AND D/B/A WAGNER'S | § | |
| CARNIVAL AND JASON WAGNER | § | |

## ORDER

IT IS ORDERED that no later than the original date set for the filing of the Joint Pretrial Order, all parties shall pre-mark and exchange exhibits they intend to use during the course of trial.

ORDERED this 23rd day of February, 2000.

JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE

## I.
## STATEMENT OF FACTS

1.      Many of the relevant facts are set forth in the Bankruptcy Court's Findings of Fact and Conclusions of Law (attached hereto as Exhibit "A").  In August, 1998, Schuehle filed a voluntary Chapter 11 petition.  At the same time, Park Pontiac-GMAC Truck, Inc. ("Park"), a car and truck dealership of which Schuehle was the sole shareholder, also filed a voluntary Chapter 11 petition.  GMAC is a creditor of both Schuehle and Park.  For the first two months of these Chapter 11 cases, Kaufman represented both Schuehle's estate and Park's estate; moreover, he attempted to obtain administrative consolidation of the two cases, which GMAC successfully opposed.  On GMAC's motion, the Bankruptcy Court disqualified Kaufman from representing both estates on conflict of interest grounds.  Thereafter, beginning on October 13, 1998, Kaufman represented only Schuehle's estate.  Harlin Womble ("Womble") was chosen as the general bankruptcy counsel for Park's estate.

2.      Although he represented only Schuehle's estate after October 13, 1998, Kaufman behaved as though he represented Park's estate as well.  He prepared a joint plan and disclosure statement for Schuehle and Park.  The gist of the plan was that Park's assets would be sold to an insider under a long-term contract that had little present value and, arguably, a negative present value.  Schuehle owned the premises on which Park operated, and, under Kaufman's initial plan, Schuehle would have continued to own the premises.  Park would pay Schuehle far less than market rental price.  Kaufman's initial plan claimed that large portions of Schuehle's own estate and of Park's were exempt.  Among other singular features, Kaufman's initial plan called for using assets from Park's estate and from Schuehle's estate to fund a spendthrift trust for the benefit of Schuehle personally.

3.     Kaufman proposed to pay creditors of both estates, to the extent that they would be paid at all, through postconfirmation litigation against GMAC. Kaufman alleged that GMAC's secured and unsecured claims could be eliminated and that additional recovery could be obtained besides. Kaufman also proposed to litigate to eliminate the large unsecured claim of Republic One, L.P. ("Republic"). Republic is a creditor of Schuehle's estate, but not of Park's estate.

4.     Kaufman filed motions and adversary proceedings accusing GMAC of prepetition wrongs, notably usury, and supposed postpetition miscreance, including an alleged violation of the automatic stay in Park's case and in Schuehle's case. Kaufman failed to pursue or to prosecute any of these claims.

5.     While Kaufman's initial plan and disclosure statement were pending, GMAC, pursuant to a court order, sought out a buyer for Park's assets and for Schuehle's real property on which Park conducted its operations. GMAC eventually located a buyer who was willing to purchase the entire package of assets for more than $12 million. On February 9, 1999, the Bankruptcy Court approved the sale. Kaufman vigorously opposed the sale at the February 9 hearing and claimed to be seeking an alternative purchaser. His efforts were fruitless. At the same time that the Court approved the sale brought by GMAC, the Court denied confirmation of Kaufman's initial plan. Eventually, the proceeds from the sale were deposited into the Registry of the Court.

6.     After the sale and denial of the confirmation of Kaufman's first plan, Kaufman prepared a second plan and disclosure statement for both Park's estate and Schuehle's estate. Like their earlier counterparts, these pleadings claimed that a large portion of the sale proceeds from both Park's estate and Schuehle's estate were Schuehle's exempt property. Kaufman's

- 3 -

second plan, like his first plan, called for using estate assets to establish a spendthrift trust for Schuehle's personal benefit. Once again, the second plan proposed to pay creditors, to the extent that they would be paid, by suing GMAC and by eliminating Republic's claim in postconfirmation litigation. Kaufman proposed to fund the postconfirmation litigation with interest earned on the proceeds of the sale that GMAC had negotiated and which the Bankruptcy Court had approved.

7.      The Bankruptcy Court denied confirmation of this second plan in September of 1999 and, just recently, approved confirmation of GMAC's creditor plan in the Park case and also approved a global settlement in Schuehle's case among Schuehle, Republic, and GMAC. Negotiations over this settlement had been finalized by Schuehle and his new attorney after Kaufman withdrew from representing Schuehle as a result of Kaufman's opposition to Schuehle's entering into this global settlement. Accordingly, as of the date of the filing of this motion, creditors in the Park case will be paid approximately fifty cents on the dollar as the result of the confirmation of GMAC's creditor plan and creditors in the Schuehle case will be paid as a result of the global settlement. Kaufman opposed GMAC's efforts in all of these matters.

8.      In May of 1999, Kaufman filed his first interim fee application; he sought the approximate amount of $650,000.00 for approximately 8 ½ months of work (approximately $590,000.00 in fees and $60,000.00 in expenses). The Bankruptcy Court held a hearing on this application on July 13, 1999. GMAC and Republic opposed the application, as did the office of the United States Trustee. The Bankruptcy Court signed its Findings of Fact, Conclusion of Law, and interim order allowing fees and expenses on September 13, 1999, and the order was

docketed on September 14, 1999[1].  Despite the objections, the Bankruptcy Court awarded Kaufman fees of approximately $535,000.00 and expenses of approximately $50,000.00, for a total of approximately $585,000.00.  Of this total amount, the Bankruptcy Court apportioned approximately $60,000.00 to the Park Pontiac estate and $525,000.00 to the Schuehle estate.  Of the $525,000.00 apportioned to the Schuehle estate, approximately $50,000.00 represented expenses and $475,000.00 represented fees.  Kaufman claimed to have retainers from Schuehle of approximately $165,000.00, and therefore after applying these funds, the balance owed to Kaufman was approximately $360,000.00 (i.e. $525,000.00 minus $165,000.00).

9.    In November of 1999, Kaufman submitted a second interim fee application requesting approximately $355,000.00 for services rendered and expenses incurred from May to mid-October of 1999.  Hence, Kaufman asserted that the total unpaid amount of his fees was approximately $715,000.00 (i.e. the balance of approximately $360,000.00 from the first interim fee application plus the amount of $355,000.00 sought from the second fee application).  A hearing was held on this second application on December 13, 1999, but the Bankruptcy Court has not yet issued a written order on these requested fees and expenses.  Accordingly, this motion only concerns Kaufman's first interim fee application—although the ruling on this motion may well affect the ruling on the second fee application.

II.

QUESTIONS PRESENTED AND RELIEF SOUGHT

10.    The issues presented by this appeal are whether the Bankruptcy Court applied the correct legal standard in determining whether a substantial portion of the fees that Kaufman

---

[1] Before ten days ran on the docketing of the interim order, GMAC filed a motion to alter or amend the order.  The Bankruptcy Court denied this motion in October of 1999, but no order was signed until February 2000.

requested are compensable at all, and whether the Bankruptcy Court erred in holding that the interest that has accrued on GMAC's cash collateral constitutes unencumbered estate assets that may be used to pay Kaufman's fees. As to the first issue, the same standards apply to an interim fee award under 11 U.S.C. § 331 as to a final fee award under 11 U.S.C. § 330. *In re Spanjer Bros., Inc.*, 191 B.R. 738, 747 (Bankr. N.D. Ill. 1996). Under 11 U.S.C. § 330(a)(1), reasonable compensation may be awarded to a debtor-in-possession's attorney for necessary services. Services are necessary if, but only if, they benefit the estate. *In re Office Products of America, Inc.*, 136 B.R. 964, 972-73 (Bankr. W.D. Tex. 1992). Unless the services for which compensation is sought are first determined to be necessary — *i.e.*, beneficial to the estate — the reasonableness of the fee sought is immaterial. *See id.* at 976-77.

11.    In late 1998, the Fifth Circuit held that, in order to be necessary and hence compensable, the services rendered must have "resulted in an identifiable, tangible, and material benefit to the bankruptcy estate." *Matter of Pro-Snax Distributors, Inc.*, 157 F.3d 414, 426 (5th Cir. 1998). The Bankruptcy Court held that *Pro-Snax* does not stand for the proposition that the efforts of a debtor's attorney must result in success in order to warrant compensation. For example, the Bankruptcy Court opined, proposing an unsuccessful plan of reorganization may meet the *Pro-Snax* test by showing creditors that there are plan options from which to choose.

12.    GMAC respectfully submits that the Bankruptcy Court erred in interpreting and applying *Pro-Snax*. Apparently, the Bankruptcy Court believed that services only need to provide some arguable benefit toward the completion of the case at the time that they were performed in order to meet the *Pro-Snax* test. This is exactly the standard that the Fifth Circuit rejected. *Pro-Snax*, 157 F.3d at 426. Commentators have noted how extraordinarily demanding the Fifth Circuit's test for necessary services is. Michael D. Sirota & Ilana Volkov, *Practice*

*Pitfalls in Chapter 11 Proceedings,* 155 N.J.L.J. 500, p. 5-20 (Feb. 1, 1999) (discussing *Pro-Snax* and noting that the Fifth Circuit's requirements are far more rigorous than those of the Third Circuit). In the case at bar, the Bankruptcy Court was disinclined to apply the strict scrutiny to Kaufman's first interim fee application that *Pro-Snax* requires.

13.     GMAC respectfully submits that proposing plans that call for the creation of a spendthrift trust for the debtor's personal benefit and that claim sweeping and dubious exemptions confers no identifiable, tangible, and material benefit on the estate. Opposing a sale that realizes millions of dollars for creditors while advocating a bargain sale to an insider confers no identifiable, tangible, and material benefit on the estate. Asserting all sorts of prepetition and postpetition claims against a creditor and then failing to pursue those claims confers no identifiable, tangible, and material benefit on anyone. Opposing a global settlement that pays unsecured creditors 100 cents on the dollar (except those who are willing to take less) and gives the individual debtor (i.e. Schuehle) his discharge and exemptions—essentially a "fresh start"—on the grounds that the settlement does not pay Kaufman 100% of his attorney's fees confers no identifiable, tangible and material benefit on the estate.

14.     The Bankruptcy Court's award of approximately $525,000.00 in fees and expenses to Kaufman in Schuehle's case rested on an erroneous view of Fifth Circuit authority. On appeal, GMAC would request this Court to clarify the requirements of *Pro-Snax* and then remand this matter to the Bankruptcy Court for further proceedings consistent with this Court's ruling regarding the application of *Pro-Snax* to Kaufman's first interim fee application.

III.

## LEAVE TO APPEAL SHOULD BE GRANTED

15.     This case concerns an interlocutory award of fees and expenses.  Under 28 U.S.C. § 158(a)(3), this Court may, in its discretion, entertain the appeal, even though the Bankruptcy Court's order is not final.  *In re Xebec*, 147 B.R. 518, 522 (9th Cir. B.A.P. 1992) (granting leave to appeal interlocutory award of attorney fees).  No statute or rule specifically guides this Court's discretion, but district courts have applied 28 U.S.C. § 1292(b) by analogy.  *In re Reserve Production, Inc.*, 190 B.R. 287, 289-90 (E.D. Tex. 1995), *appeal dismissed*, 98 F.3d 1337 (5th Cir. 1996); *see In re Berryman Products, Inc.*, 183 B.R. 463, 465 (N.D. Tex. 1995), *aff'd*, 91 F.3d 140 (5th Cir. 1996).  An appeal should be allowed if: (a) a controlling question of law is at issue; (b) there is substantial ground for disagreement about that question; and (c) the resolution of that question would materially advance the ultimate termination of the litigation.  *In re Schepps Food Stores, Inc.*, 148 B.R. 27, 29 (S.D. Tex. 1992) (allowing interlocutory appeal under these standards).  All of these criteria are satisfied here.

16.     *First*, there are controlling questions of law, namely, the proper interpretation and application of the holding in *Matter of Pro-Snax Distributors, Inc.*, 157 F.3d 414, 426 (5th Cir. 1998).  In such a case, *de novo* review is appropriate.  *In re Pro-Snax Distributors, Inc.*, 212 B.R. 834, 835-36 (N.D. Tex. 1997), *aff'd*, 157 F.3d 414 (5th Cir. 1998).

17.     *Second*, there are genuine grounds for taking issue with the Bankruptcy Court's interpretation of what *Pro-Snax* requires.  The Bankruptcy Court apparently believed that services may make an identifiable, tangible, and material benefit to the estate if they made any sort of arguably reasonable contribution to the case at the time they were performed, even if there was no successful result.  This was precisely the view that the Fifth Circuit rejected.  *Pro-Snax*, 157 F.3d at 426.

- 8 -

18.    *Third*, resolving the issues at this stage will materially advance the ultimate termination of the litigation.  Once the Bankruptcy Court, Kaufman, and GMAC have been apprised of the correct legal standard, there should be small room for disagreement when Kaufman submits a final fee application.  Thus, further disputes may be kept to a minimum, and it is possible that no appeal will be necessary when a final fee award is made.

WHEREFORE, GMAC prays the Court to exercise its discretion in favor of allowing this appeal, and to grant GMAC such other and further relief, at law or in equity, as the Court may deem just and proper.

Respectfully submitted,

By: _____ *Michael P. Ridulfo*

Michael P. Ridulfo, Attorney-in-Charge
State Bar No. (SBN 16902020)

OF COUNSEL:

SORRELL, ANDERSON, LEHRMAN,
MAIXNER & RIDULFO, L.L.P.
711 North Carancahua
American Bank Plaza, Suite 1200
Corpus Christi, Texas  78475
(361) 884-4981
(361) 884-9618 FAX

William H. Daniel (SBN 05362700)
Jeff Bohm (SBN 02564850)
McGINNIS, LOCHRIDGE & KILGORE, L.L.P.
919 Congress Avenue, Suite 1300
Austin, Texas  78701
(512) 495-6000
(512) 495-6093 FAX

ATTORNEYS FOR GENERAL MOTORS
ACCEPTANCE CORPORATION

## CERTIFICATE OF SERVICE

I hereby certify that on this _14_ day of February, 2000, a true and complete copy of the above and foregoing Motion was sent by regular first class mail to the following:

(1)   DEBTOR:

     John Schuehle
     831 Bay Street
     Aransas Pass, Texas  78436

(2)   FORMER COUNSEL FOR THE DEBTOR:

     Colin Kelly Kaufman
     P. O. Box 1662
     Corpus Christi, Texas  78403-1662

     David Kirk, local counsel
     6803-B West Avenue
     San Antonio, Texas  78213

(3)   PRESENT COUNSEL FOR THE DEBTOR:

     Ron Simank
     Schauer, Simank & Ledbetter
     615 Upper North Broadway
     Suite 2000 MT159
     Corpus Christi, Texas 78477

(4)   SPECIAL COUNSEL FOR PARK PONTIAC:

     James T. McMillen
     801 Ayers Street
     Corpus Christi, Texas 78404

(5)   GENERAL COUNSEL FOR PARK PONTIAC:

     Harlin C. Womble, Jr.
     Jordan, Hyden, Womble & Culbreth, P.C.
     900 NationsBank Center North
     500 North Water Street
     Corpus Christi, Texas 78471

(6)   UNITED STATES TRUSTEE:

Ms. Nancy Holley
Assistant U.S. Trustee
515 Rusk, #3516
Houston, Texas  77002

Office of the U.S. Trustee
1107 Wilson Plaza West
606 N. Carancahua
Corpus Christi, Texas  78476

(7)   20 LARGEST UNSECURED CREDITORS:

Chase Automotive Financial
P.O. Box5210
New Hyde Park, NY 11042

Sybil Silverand
624 N. Rice
Aransas Pass, TX 78336

The GM Card
P.O. Box 7009
Anaheim, CA 92850-7009

T.J. Jimenez
Route 1, Box 233
Fredericksburg, TX 78624

Chevron USA Products, Inc.
P.O. Box 5010, Sec. 230
Concord, CA 94524-1377

MCI
P.O. Box 13326
Austin, TX 78711

Crystal Pools
Box 104
Fulton, TX 78358

Farm Plan
Department 77175
P.O. Box 77000
Detroit, MI 48277-0175

Pool Doctor
P.O. Box 661
Fredericksburg, TX 78624

Eloise Ramos
414 Odell
San Antonio, TX 78212

GTE
P.O. Box 920041
Dallas, TX 75392-0041

Erlinda Adame
P.O. Box 173
Ingleside, TX 78362

Southwestern Bell Wireless
P.O. Box 4460
Houston, TX 77097-0082

Diners Club
P.O. Box 6003
The Lakes, NV 88901-6003

Paragon Cable
P.O. Box 460849
San Antonio, TX 78246-0849

AT&T
P.O. Box 630060
Dallas, TX 75362-0060

Garbage Gobbler
602 Leal St.
San Antonio, TX 78207

Southwestern Bell
P.O. Box 1780
Houston, TX 77251

(8)   PARTIES REQUESTING NOTICE:

Michael G. Colvard
Martin Drought & Torres, Inc.
2500 NationsBank Plaza
300 Convent Street
San Antonio, Texas  78205

Mark Stromberg
Shields, Britton & Fraser
14643 Dallas Parkway, #920
Dallas, Texas  75240

Jan Perry Lederer, P.C.
7551 Callaghan, #300
San Antonio, Texas  78229

Billy G. Leonard, Jr.
Strasburger & Price, L.L.P.
4300 NationsBank Plaza
901 Main Street
Dallas, TX 72502

Thomas W. Howe
1001 Pat Booker, Suite 200
Universal City, TX 48148

David G. Aelvoet
Heard, Goggan, Blair & Williams
310 S. St. Mary's Street
Tower Life Bldg., 9th Floor
San Antonio, TX 78205

Lorri Michel
Linebarger Heard Goggan Blair
P.O. Box 17428
Austin, TX 78760

(9)   OTHER PARTIES-IN-INTEREST SET FORTH ON THE "SCHUEHLE SHORT
SERVICE LIST" USED BY COUNSEL FOR THE DEBTOR:

Securities Exchange Commission
500 W. Madison, #1400
Chicago, IL  60661

Internal Revenue Service
300 E. 8th Street, Stop 5022-AUS
Austin, Texas  78701

_____
Michael P. Ridulfo

©2009 www.texis.com

Case 2:00-cv-00023    Document 9    Filed in TXSD on 02/23/2000    Page 14 of 41

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

United States Bankruptcy Court
Southern District of Texas
ENTERED

SEP 14 1999

*Carolyn et al*

Michael N. Milby, Clerk of Court

IN RE:                                    §
                                          §
JOHN R. SCHUEHLE                          §          CASE NO. 98-21285-C-11
                                          §               (Chapter 11)
        *Debtor*                          §

## FINDINGS OF FACT AND CONCLUSIONS OF LAW WITH RESPECT TO COLIN K. KAUFMAN'S FIRST INTERIM FEE APPLICATION

On this day came on for consideration Colin K. Kaufman's First Interim Fee Application. The Court, having heard the evidence and arguments of counsel, and having reviewed the pleadings, briefs, and the fee application makes the following findings of fact and conclusions of law.

### PROCEDURAL HISTORY

On July 13, 1999, the Court conducted a hearing on Colin K. Kaufman's First Interim Fee Application (the "Application") in the above-styled and numbered case. At this hearing appeared Colin K. Kaufman ("Kaufman"), on behalf of himself, Jeff Bohm ("Bohm"), on behalf of General Motors Acceptance Corporation ("GMAC"), an objecting creditor to the Application; Michael G. Colvard ("Colvard"), on behalf of Republic Credit One, L.P. ("Republic"), another objecting creditor; Barbara Kurtz, attorney representative for the United States Trustee's Office, which had also filed an objection to the Application; and Harlin Womble ("Womble"), general counsel for Park Pontiac GMC-Truck, Inc. ("Park Pontiac"). The parties stipulated to the admissibility of exhibits, and, accordingly, GMAC's exhibits 1 through 60 were admitted, and Kaufman's exhibits numbers 1, 2, 26, 27, 28 and 29 were also admitted. Where appropriate, findings of fact shall be deemed conclusions of law and conclusions of law shall be deemed findings of fact.

1

## JURISDICTION

The Court has jurisdiction over this Chapter 11 case pursuant to 28 U.S.C. § 1334. The matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (3), and (E)

## FINDINGS OF FACT

1. John R. Schuehle ("Schuehle") filed a voluntary Chapter 11 petition on August 17, 1998.

2. According to the Schedules filed by Schuehle, on the date of the filing of his petition, Schuehle owned 100% of the stock of Park Pontiac, which was an automobile dealership located in San Antonio, Texas, and he also owned all of the real property on which Park Pontiac's operations were located (the "Real Property").

3. On August 17, 1998, Park Pontiac also filed a voluntary Chapter 11 petition.

4. On August 17, 1998, when both Schuehle and Park Pontiac filed their petitions, Kaufman was representing both of these debtors and their respective bankruptcy estates.[1]

5. On August 18, 1998, Kaufman, on behalf of both Schuehle and Park Pontiac, filed a motion to consolidate the two cases.

6. On August 21, 1998, this Court signed an agreed order among Schuehle, Park Pontiac, and GMAC which, among other things, gave GMAC standing to seek to sell the assets of Park Pontiac and also the Real Property (hereinafter referred to collectively as the "Dealership"). At the end of August, Ms. Wanda Hartnuss ("Hartnuss") began marketing the Dealership. During

---

[1] Hereafter, when reference is made to Kaufman representing Schuehle and/or Park Pontiac, this reference means that Kaufman is representing the Chapter 11 bankruptcy estate of Schuehle and/or the Chapter 11 bankruptcy estate of Park Pontiac.

the months of September, October, and November, Hartnuss spent considerable time negotiating with several prospective purchasers of the Dealership.

7. On September 4, 1998, GMAC filed a response in opposition to the motion to consolidate the cases.

8. On September 15, 1998, Schuehle filed his application to employ Kaufman as counsel for Schuehle. On this same day, Park Pontiac filed its application to employ Kaufman as counsel for Park Pontiac. Kaufman represented that he had no conflict of interest in representing Schuehle and Park Pontiac.

9. On September 22, 1998, this Court held a hearing on, among other matters, the motion to administratively consolidate the two cases. The Court took this matter under advisement, and subsequently, on November 10, 1998, the Court denied the motion.

10. On September 28, 1998, GMAC filed a motion in Park Pontiac's case to disqualify Kaufman as Park Pontiac's counsel due to a conflict of interest in representing both Schuehle's estate and Park Pontiac's estate. GMAC requested an expedited hearing and this Court granted the request.

11. On September 29, 1998, a hearing was held on GMAC's motion, and Kaufman vigorously opposed the motion. At the close of the hearing, the Court told Kaufman that he could file a brief in support of his opposition to the motion. Thereafter, Kaufman filed a response opposing GMAC's Motion to Disqualify.

12. On October 13, 1998, the Court announced in open court that it had decided to grant GMAC's motion, and that therefore Kaufman could not represent both Schuehle and Park Pontiac. As a result of this ruling, Kaufman chose to represent Schuehle, and Womble thereafter became general counsel for Park Pontiac.

3

13. On October 19, 1998, Kaufman, on behalf of both Schuehle and Park Pontiac, filed one disclosure statement and one plan (the "First Plan"), plus exhibits. The disclosure statement, the First Plan, and the exhibits associated with these pleadings, totaled approximately 350 pages. The First Plan proposed, among other things, that Thomas Gardner ("Gardner"), who was general manager of Park Pontiac for several years prior to the filing of the petition and who became president after the bankruptcy filing, would purchase the Dealership.

14. On November 24, 1998, GMAC filed a motion to sell the Dealership free and clear of all liens, and on November 30, 1998, Kaufman filed a response opposing this motion. GMAC's motion requested the Court to approve the sale of the Dealership to Tubbs Enterprises, Inc ("Tubbs"), and attached to the motion was the Asset Purchase Agreement that Tubbs had signed.

15. The major terms of the Tubbs offer were as follows:  (a) $8,780,000 for the Real Property; (b) $1.0 million for Park Pontiac's good will; (c) $1.6 million for furniture, fixtures and equipment, (d) $882,700 for used vehicles; and (e) invoice price for new vehicles.

16. On December 21, 1998, Kaufman, on behalf of Schuehle, filed a Motion to Estimate GMAC's claim at zero or to determine that GMAC may not vote on the First Plan on bad faith grounds.  On this same day, Kaufman, on behalf of Schuehle, filed a Motion to Estimate Republic's claim at zero and determine that Republic may not vote on the First Plan.

17. On December 23, 1998, Republic filed an objection to confirmation of the Plan.

18. On December 28, 1998, First Extended Service Corporation, which filed a Proof of Claim in Park Pontiac's case for $1.6 million, filed an objection to confirmation of the First Plan

19. On December 28, 1998, GMAC filed an objection to confirmation of the First Plan.

4

20. On December 28, 1998, GMAC also filed an objection to certain exemptions claimed by Schuehle.

21. On December 28, 1998, GMAC filed a response to Schuehle's motion to estimate GMAC's claim at zero.

22. On January 5, 1999, Kaufman drafted for both estates, and filed on behalf of Schuehle's estate, a motion for approval of post-petition financing. GMAC filed an objection to this motion.

23. On January 5, 1999, Kaufman gave all creditors in both cases notice that the hearing on the confirmation of the First Plan, as amended, was set for January 15, 1999. On January 6, 1999, Republic filed a response to Schuehle's motion to estimate Republic's claim at zero.

24. On January 11, 1999, this Court held a hearing on the motions of Schuehle and Park Pontiac for approval of post-petition financing. The Court took this matter under advisement and four days later ruled that the motion would be denied because the test for granting a super priority lien could not be met.

25. On January 12, 1999, this Court held a hearing on the motions of Schuehle and Park Pontiac to estimate GMAC's claim at zero and the motion of Schuehle to estimate Republic's claim at zero.

26. On January 14, 1999, this Court ruled on the motions to estimate GMAC's claim and Republic's claim at zero. The Court held that for the purposes of voting on the Plan, GMAC's secured claim would be $17.5 million, GMAC's unsecured claim would be $3.0 million, and Republic's unsecured claim would be $30.0 million.

27. On January 15, 1999, at the beginning of the hearing on the confirmation of the First Plan, Kaufman announced to this Court that the banker who was employed at the bank that was

5

allegedly to extend financing to Tommy Gardner to purchase the Dealership (pursuant to the terms of the First Plan) had resigned from the bank and that Schuetle and Park Pontiac wanted to continue the hearing. The Court granted this request and scheduled the continued hearing for February 9, 1999. However, the Court conditioned this continuance on Gardner having a written commitment by January 29, 1999 from a bank for financing.

28. The Court then used the remainder of the day on January 15 to hear GMAC's motion to sell the Dealership free and clear of liens, and also to compare the Tubbs offer with the proposal in the First Plan that called for Gardner to purchase the Dealership. Kaufman, on behalf of Schuehle, vigorously opposed GMAC's motion to sell the Dealership to Tubbs and argued in favor of the Gardner proposal. At the close of the hearing, the Court ordered GMAC's counsel to give notice to all of the parties who had previously made offers to GMAC for the purchase of the Dealership that if they wanted to purchase the Dealership, then they would need to file, by January 25, 1999, an objection to the Tubbs offer, plus their own offer. Moreover, the notice was also to include a statement that any offers would have to be at a materially higher price with comparable cash terms and for similar assets (than the Tubbs offer) in order for the Court to consider any offer other than the one that Tubbs had submitted to GMAC. Finally, the notice was to include a paragraph setting forth that a hearing would be held on January 26, 1999 on any objections filed on or before January 25, 1999.

29. Counsel for GMAC complied with the Court's order by sending the notice on January 15, 1999 and by filing a certificate of service to that effect on January 19, 1999.

30. On January 25, 1999, Jack Guenther ("Guenther") filed an objection to GMAC's motion to sell the Dealership free and clear of liens and submitted its own offer to purchase

6

certain assets from Park Pontiac.[2]  Guenther offered to purchase the following assets from Park Pontiac for the following prices:  (a) furniture, fixtures and equipment for $1.1 million; (b) goodwill for $1.8 million; (c) invoice price for new vehicles; and (d) current appraised values for used vehicles.  Unlike Tubbs,  Guenther did not propose to purchase the Real Property.  Guenther's objection set forth that in the event he was the successful bidder for the above-described assets of Park Pontiac, he would be willing to lease the Real Property from the Schuehle estate.

31.  On January 25, 1999, Republic filed an objection to certain exemptions claimed by Schuehle.

32.  On January 26, 1999, this Court held a hearing on Guenther's objection to GMAC's motion and heard evidence on Guenther's offer to buy certain assets from Park Pontiac's estate.  The court also heard evidence comparing the Tubbs offer to the Guenther offer.  Kaufman, on behalf of Schuehle, opposed GMAC's motion to sell Dealership to Tubbs and supported the Guenther offer.  Kaufman supported Guenther's proposed offer even though it, unlike the Tubbs offer, did not include purchasing the Real Property (which was owned solely by the Schuehle estate).  After hearing the evidence and arguments of counsel, this Court stated that it would make no decision on whether to approve the Tubbs offer because the Debtor was to have another chance 9 at confirming the First Plan on February.  The Court made it clear that if the First Plan was not confirmed on February 9, 1999, "the Tubbs deal goes through."

33.  On January 28, 1999, Kaufman filed a pleading entitled "Notice of Filing of Jack Guenther's Comparison of His Offer to Tubbs' Offer."  Through the filing of this Notice,

---

[2] In fact, the objection was filed by Nordic Imports II, Ltd. and the offer was made by an entity known as TPC Management Inc.  Both Nordic and TPC are entities in which Guenther is a principal, and to avoid confusion, the Court simply refers to Guenther throughout this opinion.

Kaufman, on behalf of the Schuehle estate, continued to indicate that he supported the Guenther offer and opposed the Tubbs' offer.

34. On January 29, 1999, Kaufman filed a pleading entitled "Notice of Buyer's Financing and of Reset Hearing to Confirm Plan of Reorganization." In this notice, Kaufman set forth that Gardner had obtained financing to purchase the dealership and that the confirmation hearing on the First Plan would go forward on February 9, 1999. Attached to this notice was a letter from NationsBank to Jack Pagan ("Pagan"), an automobile dealer in the Corpus Christi area, setting forth that NationsBank was interested in the possibility of providing Pagan $7.0 million of floor plan financing, which debt would be guaranteed by Pagan and Gardner. Pagan was to be the "white knight" who would purchase the Dealership in an arrangement whereby Gardner would be a minority shareholder and would also be responsible operations of the Park Pontiac dealership.

35. On February 5, 1999, Kaufman filed a motion for protective order with respect to the deposition of John R. Schuehle, and this motion attempted to prevent GMAC from deposing Schuehle regarding various aspects of the Plan. The Court denied the motion. Accordingly, GMAC's counsel deposed Schuehle on February 8, 1999.

36. On February 8, 1999, the day before the confirmation hearing, Schuehle and Park Pontiac filed an adversary proceeding against GMAC (Adversary Proceeding No. 99-2028) asserting that, among other things, GMAC had committed usury and violated the automatic stay and was entitled to a judgment against GMAC for millions of dollars.

37. On February 9, 1999, Kaufman announced to the Court that he did not have an enforceable contract with Pagan. The Court stopped the confirmation hearing, and denied confirmation of the First Plan. The Court then proceeded with arguments regarding the

8

proposed sales before it.   Kaufman, on behalf of Schuehle, opposed approval of the Tubbs offer and supported approval of the Guenther offer. After hearing these arguments, the Court granted GMAC's motion for sale of the Dealership to Tubbs.  The Court signed an order granting this motion, and the order was entered on the docket.

38 The Order denying confirmation of the First Plan was entered on February 17, 1999.

39 On February 18, 1999, Schuehle filed a motion to reconsider the order approving the sale of the dealership to Tubbs and denying confirmation of the First Plan.   On March 3, 1999, the Court denied this motion in its entirety.

40 On February 26, 1999, GMAC's counsel and Womble, Park Pontiac's counsel, filed a joint motion for approval of management agreement.  The purpose of seeking approval of the management agreement was to allow Tubbs to operate the Park Pontiac dealership pending closing of the sale.  The sale could not close without Tubbs receiving approval from General Motors Corporation ("GM") to be an authorized GM dealer.  GM eventually gave its approval.

41. On March 1, 1999, Schuehle filed a response opposing this motion. On the same day, this Court granted the joint motion of GMAC and Park Pontiac.

42. On March 3, 1999, Kaufman filed another disclosure statement and another plan (the "Second Plan")  Kaufman signed both of these pleadings; he signed himself on behalf of Schuehle and he also signed on behalf of Jim McMillen, in Mr. McMillen's capacity as special counsel to Park Pontiac.

43 On April 13, 1999, Kaufman filed a motion to postpone or cancel the closing on the sale of the Dealership, and requested an emergency hearing on this motion   On April 16, 1999, the Court held a hearing on this motion and denied the motion

9

ChkPDF - www.fasiio.com

44. On April 16, 1999, Kaufman filed a Motion to Condition, Postpone or Cancel Closing of the Sale of the Dealership to Tubbs, and on April 29, 1999, Kaufman filed a sixteen-page memorandum in support of this motion.  The Court also denied this motion.

45. On April 19, 1999, GMAC's counsel filed a disclosure statement and a liquidating plan of reorganization in the Park Pontiac case.

46. On May 3, 1999, closing took place to effectuate the sale of the Dealership to Tubbs, and approximately $11.5 million was deposited into the registry of the Court.[3]

47. On May 20, 1999, GMAC's counsel and Republic's counsel filed a joint disclosure statement and joint liquidating plan of reorganization in the Schuehle case.

48. The plan filed by GMAC in the Park Pontiac case, the plan filed by GMAC and Republic in the Schuehle case, and the Second Plan filed by Kaufman for both the Schuehle case and the Park case are all scheduled for a confirmation hearing on September 14, 1999.

49. On May 12, 1999, Kaufman filed the Application (which includes time sheets totaling over 400 pages for the period August 17, 1998 through April 30, 1999) seeking total fees in the amount of $589,108.00 and total expenses in the amount of $62,703.44.  Kaufman seeks $126,149.00 in fees and $63,074.50 in expenses from the Park Pontiac estate; and he seeks approximately $463,000.00 in fees and no expenses from the Schuehle estate.  Further, to the extent that one estate cannot pay the fees and expenses that he seeks, he reserves the right to subsequently request that the other estate pay the balance of these fees and expenses (see the last sentence of paragraph 9 of the Application).

---

[3] Subsequently, more funds were deposited into the registry of the Court.  This time, the funds were transferred from the so-called "GMAC Cash Collateral Account" (one of Park Pontiac's accounts) to the registry of the Court.  Approximately $5.1 million was transferred which, when added to the $11.5 million from the sale to Tubbs, means that approximately $16.6 million is presently on deposit in the registry of the Court.

50. On May 28, 1999, GMAC filed an objection to the Application; GMAC amended this objection on July 13, 1999. Republic and the United States Trustee's Office also filed objections to the Application.

51. On June 15, 1999, GMAC filed an objection to the claim of First Extended Service Corporation which had filed a proof of claim in the amount of $1.6 million.

52. On June 25, 1999, First Extended Service Corporation filed a response to GMAC's objection and in this response set forth that it would not oppose the objection filed by GMAC.

53. Kaufman is an experienced bankruptcy attorney, having practiced in the bankruptcy field for approximately 30 years and having represented debtors in multiple Chapter 11 cases for over 12 years in Corpus Christi. Kaufman is board certified in both business bankruptcy law and consumer bankruptcy law.

54. Sharon K. Kaufman (Mrs. Kaufman) is Kaufman's wife, and is employed at his law firm. Mrs. Kaufman has a law degree but is not a licensed attorney, the Application refers to her as a "supervisor." Mrs. Kaufman performs paralegal services. Mrs. Kaufman has more experience than a recent law school graduate and more education than a paralegal.

55. Casandra Hinojosa and Debra Tedesco are also employed at Kaufman's firm, but are not related to Kaufman. With respect to Ms. Hinojosa and Ms. Tedesco, Kaufman considers them legal assistants and secretaries. Ms. Hinojosa and Ms. Tedesco perform services more akin to a "runner" and general office help than legal assistant or secretary. In fact, they do not even answer telephones. Ms. Hinojosa and Ms. Tedesco are not paralegals.

## CONCLUSIONS OF LAW

### A. STANDARDS FOR REVIEWING A FEE APPLICATION

1. Although Kaufman has submitted an interim fee application under 11 U.S.C. § 331, the same substantive standards govern as though he had submitted a final fee application under 11 U.S.C. § 330. *In re Spanjer Bros., Inc.*, 191 B.R. 738, 747 (Bankr. N.D Ill. 1996). An attorney for a debtor-in-possession bears the burden of proving his or her entitlement to compensation. *Matter of Evangeline Refining Co.*, 890 F.2d 1312, 1326 (5th Cir. 1989).

2. Unlike the former Bankruptcy Act, the Bankruptcy Code contemplates that an estate's professionals will be compensated at a rate similar to the market rate for comparable nonbankruptcy work. *Matter of U.S. Golf Corp.*, 639 F.2d 1197, 1201 (5th Cir. 1981). This does not mean, however, that an attorney may bill as much as he or she pleases. An estate should not be consumed by professional fees, *In re Arnold*, 176 B.R. 13, 15-16 (Bankr. E.D. Tex. 1995); *accord, Matter of Taxman Clothing Co.*, 49 F.3d 310, 316 (7th Cir. 1995), and a Chapter 11 case should not be a "cash cow" for professionals. *In re Matthews*, 154 B.R. 673, 681 (Bankr. W.D. Tex. 1993) (citing *Matter of Hutter Const. Co.*, 126 B.R. 1005, 1013 (Bankr. E.D. Wis. 1991)). Every dollar expended on administrative costs is a dollar less for creditors, equity holders, or the individual debtor. *In re Pettibone Corp.*, 74 B.R. 293, 299 (Bank. N.D. Ill. 1987) The Fifth Circuit has admonished that an estate should not be depleted by needless legal costs. *Matter of Consolidated Bancshares, Inc.*, 785 F.2d 1249, 1255 (5th Cir. 1986).

3. It follows that, when applying for compensation, an estate professional should use "billing judgment." *Matter of Pothoven*, 84 B.R. 579, 584-85 (Bankr. S.D. Iowa 1988). An attorney should bill an estate in the same way that he or she would bill a sophisticated client of means; the attorney must make a good faith effort to exclude hours or costs that are excessive,

12

redundant, or otherwise unnecessary or inappropriate. *Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S. Ct. 1933, 1939-40, 76 L. Ed. 40 (1983); *Spanjer Bros.*, 191 B.R. at 748; *In re Temple Retirement Community, Inc.*, 97 B.R. 333, 339 (Bankr. W.D. Tex. 1989).

4.   The court bears the responsibility to see to it that a fee applicant has fulfilled the duty to exercise billing judgment. *In re Stromberg*, 161 B.R. 510, 517 (Bankr. D. Colo. 1993). Thus, even if no party-in-interest objects to a fee application, a court has a duty to scrutinize an application carefully. *In re Saunders*, 124 B.R. 234, 236 (Bankr. W.D. Tex. 1991); *accord In re NRG Resources, Inc.*, 64 B.R. 643, 650 (W.D. La. 1986). The estate should be regarded as a sophisticated consumer of legal services, and a court, standing in the shoes of the estate, should allow only those fees that a prudent attorney would bill and that a sophisticated client would pay in a nonbankruptcy context. *In re Bennett Funding Group, Inc.*, 213 B.R. 234, 248 (Bankr. N.D.N.Y. 1997); *In re Jefsaba, Inc.*, 172 B.R. 786, 797-800 (Bankr. E.D. Pa.).

5   In undertaking this scrutiny, a two-part analysis is necessary. 11 U.S.C. § 330(a)(1)(A) requires that "reasonable compensation" shall be given for "actual, necessary services rendered." Accordingly, before even deciding whether the amount requested is reasonable, a court must first determine that the services were actual and necessary. *In re Stromberg*, 161 B.R. 510, 514 (Bankr. D. Colo. 1993); *In re Farah*, 141 B.R. 920, 923 (Bankr. W.D. Tex. 1992). There is no evidence that the services described in the time sheets attached to the Application were not actually rendered by Kaufman and others at his firm. Hence, the question is whether these services were necessary.

6   Services are necessary if, but only if, they benefit the estate. *In re Office Products of America, Inc.*, 136 B.R. 964, 972-73 (Bankr. W.D. Tex. 1992). Refining this standard, the Fifth Circuit has held that the services must confer an identifiable, tangible, and material benefit to

13

the estate. *Matter of Pro-Snax Distributors, Inc.*, 157 F.3d 414, 426 (5th Cir. 1998). In other words, if the services did not confer an identifiable, tangible, and material benefit on the estate, there is no further inquiry. If the services were unnecessary, it is useless to ask whether the amount requested is reasonable.

7.   If the services have been shown to be necessary—*i.e.* an identifiable, tangible and material benefit to the estate has been shown—then the Court must inquire whether the amount requested is reasonable. *See, Office Products*, 136 B.R. at 976-77. In determining whether the amount requested is reasonable, this Court must employ the 12-factor test set forth in *Johnson v. Georgia Hwy. Exp., Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), made applicable to bankruptcy cases by *Matter of First Colonial Corp. of America*, 544 F.2d 1291, 1299 (5th Cir. 1977), *cert. denied*, 431 U.S. 904 (1977).

8.   The decision in *Matter of DP Partners Ltd. Partnership*, 106 F.3d 667 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 63 (1997), illustrates this two-step approach. That case involved a creditor's claim for attorney fees under 11 U.S.C. § 503(b), but the principles involved apply to a case under § 330 or § 331. The Fifth Circuit first scrutinized the record to determine that the creditor actually had made a substantial contribution to the estate. To meet this standard, the creditor had to show that it had made a contribution to the reorganization process that was of considerable value, amount, or worth. The contribution had to serve the estate, not just the creditor's own interests. Clearing this hurdle showed that the expenses were "actual and necessary." *Id.* at 672-73. Having determined that the expenses were "actual and necessary," the Fifth Circuit remanded the case for an application of the *Johnson/First Colonial* factors so that a reasonable amount could be awarded. *Id.* at 673-74; *see In re Milo Butterfinger's, Inc.*, 218 B.R. 856 (Bankr. N.D. Tex. 1997) (discussing and applying *DP Partners*)

14

9.  The Court disagrees with GMAC's assertion that a successful result is required before there can be payment from the estate assets.  Actual success is not the only evidence of a substantial or direct and material benefit.  For instance, the filing of a competing plan of reorganization may well benefit the estate because multiple reorganization options are presented and the creditors have an opportunity to select among them.  Once a substantial or direct and material benefit is established then the inquiry shifts to reasonableness, applying the *Johnson/First Colonial* inquiry

10  Kaufman's representation of both Schuehle and Park Pontiac ceased on October 13, 1998, when the Court ordered separate counsel and he elected to represent Schuehle. Kaufman's fee application in the Park Pontiac case was limited to fees and expenses incurred through October 13, 1998.  Kaufman's billing records do not separate time spent for Park Pontiac and time spent for Schuehle  The fees accrued through October 13, 1993,  in both the Park Pontiac and Schuehle cases combined, total $126,149.00. Combined expenses through October 13,1998, total $11,110.08  Kaufman failed to prove his allegation that 90% of the fees and expenses incurred were for the benefit of Park Pontiac.  The Court finds that the fees and expenses incurred through October13, 1998, should be allocated equally between the two cases. The remaining fees and expenses all belong to the Schuehle estate. The Schuehle fee application should therefore be reduced by $63,074.50 for fees and $5,555.04 for expenses at the outset.  Accordingly, the starting point for the Schuehle fee application is $526,033.50 ($589,108.00 - 63,074.50) for fees and $57,148.84 (62,703.44 - 5,555.04) for expenses.

15

ClibPDF - www.fastio.com

## B. SERVICES THAT DID NOT CONFER AN IDENTIFIABLE, TANGIBLE, AND MATERIAL BENEFIT ON THE ESTATE MAY NOT BE COMPENSATED

### 1. SERVICES THAT WERE NOT DESIGNED TO BENEFIT THE ESTATE MAY NOT BE COMPENSATED, IRRESPECTIVE OF THE RESULTS ACHIEVED.

11. The "necessary" requirement of 11 U.S.C § 330(a)(1)(A) has two aspects: there must have been an identifiable, tangible and material benefit, and that benefit must have flowed to the estate. *Matter of Pro-Snax Distributors, Inc.*, 157 F.3d 414, 426 (5th Cir. 1998). It does not matter how reasonable the rate or the number of hours may be if it was not necessary or useful to the estate to perform that task. *In re Amdura Corp.*, 139 B.R. 963, 968 (Bankr D Colo 1992), *aff'd*, 39 F 3d 1131 (10th Cir 1994).

12. In the first place, charges for patently frivolous services such as babysitting a debtor's children are not compensable, such services are unnecessary in that they confer no benefit on the estate. *In re Stromberg*, 161 B R. 510, 517-19 (Bankr. D. Colo 1993) (chastising debtor's counsel for his "singular inability or unwillingness to exercise any billing judgment"). Several items in the Application fall into this category, including reviewing invoices from third parties such as court reporters, reviewing green cards from certified mail; receiving and reviewing telephone message slips; traveling to the courthouse to file pleadings; decorating and arranging for parties, and instructing staff to send faxes, make copies, run errands, and buy food No prudent or reasonable attorney would bill a non-bankruptcy client for such matters, and no sophisticated consumer of legal services would pay such a bill The court finds that the compensation requested should be reduced by 5% for the inclusion of these unnecessary expenses. This results in a total reduction of $26,301.67 Adjusting for the amount attributable to the Park Pontiac case ($3,153.73) results in a net reduction of $23,147.94.

16

2.  THE ATTORNEY'S EFFORTS MUST HAVE PRODUCED AN IDENTIFIABLE,
    TANGIBLE, AND MATERIAL BENEFIT.

13. Even if an attorney's efforts were intended to benefit the estate rather than the debtor personally, they must have resulted in an identifiable, tangible, and material benefit to the estate before they may be deemed necessary. *Matter of Pro-Snax Distributors, Inc.*, 157 F.3d 414, 426 (5th Cir. 1998); *see In re MFlex Corp.*, 172 B.R. 854, 857 (Bankr. W.D. Tex. 1994). Other courts have agreed. An identifiable, tangible and material benefit to the estate is not merely one factor to be considered, it is the threshold requirement for allowing the attorney any compensation at all. *In re Stromberg*, 161 B.R. 510, 514 (Bankr. D. Colo. 1993) (citing *In re Federman Enterprises, Inc.*, 997 F.2d 1341 (10th Cir. 1993))

14. The Court does not, however, interpret *Pro-Snax* as standing for the proposition that success on the merits determines reasonableness of the services. The court finds that other than the matters excluded herein, the services rendered produced an identifiable, tangible and material benefit to the estate.

15. The court is troubled by Kaufman's admission that he opposed the Motion to Disqualify his employment when he did not believe he could prevail, simply to try to obtain use of GMAC's cash collateral. Such a tactic is not the clever litigation strategy asserted by Kaufman, but treads dangerously on Rule 9011 violation. Accordingly, the time spent by Kaufman opposing his disqualification from representation of both Park Pontiac and Schuehle, which this Court calculates to be 14.9 hours (13.9 for drafting the objection and brief and 1 hour for argument in court), results in a reduction of $3,352.50. One half of that amount is $1,676.25, the amount by which Schuehle fees should be reduced.

16. Under *Pro-Snax*, the services discussed above are not necessary within the meaning of 11 U.S.C. § 330(a)(1)(A). Accordingly, the Court need not reach the question whether the fees that

17

Kaufman has requested for these services are reasonable. Reasonable or not, Kaufman's fees for these services may not be paid from estate assets. Therefore, the amounts for these services, which total $23,147.94 for unnecessary fees and $1,676.25 for opposing disqualification, are disallowed in full.

## C    FOR THOSE SERVICES THAT WERE NECESSARY, ONLY REASONABLE COMPENSATION MAY BE AWARDED

17. Once an applicant has shown that his or her services were necessary, 11 U.S.C. § 330(a)(1)(A) provides that a court may award reasonable compensation for those services. Some, though not all, of the services for which Kaufman has requested compensation were necessary for the estate. Accordingly, this Court may compensate those services at a reasonable rate.

18. In determining reasonableness, the Court must apply the 12 factors set forth in *Johnson v. Georgia Hwy Exp., Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974) and *Matter of First Colonial Corp. of America*, 544 F.2d 1291, 1299 (5th Cir. 1977), *cert. denied*, 431 U.S. 902 (1977). The Fifth Circuit has instructed lower courts that four of these considerations are of special importance (a) the time and labor required (the first of the *Johnson/First Colonial* factors); (b) the customary fee (the fifth factor); (c) the amount involved and the results obtained (the eight factor); and (d) the experience, reputation, and ability of the applicant (the ninth factor) *Copper Liquor Co. v. Adolph Coors Co.*, 624 F.2d 575, 583 (5th Cir. 1980). Accordingly, the Court will look first to these four considerations and then examine the remaining eight. *See In re Kendavis Indus. Intern., Inc.*, 91 B.R. 742, 748 (Bankr. N.D. Tex. 1988) (giving special weight to the four considerations highlighted in *Copper Liquor*).

18

## 1. TIME AND LABOR REQUIRED.

19   Compensation should not be awarded for excessive time spent on particular tasks.  *In re Dawson*, 180 B.R. 478, 483 (Bankr. E.D. Tex. 1994).  In particular, excessive time spent on drafting pleadings or on document review warrants a reduction to a reasonable level.  *In re Arnold*, 176 B R  13, 16 (Bankr. E.D. Tex  1995); *see In re Smith*, 48 B.R  375, 380 (Bankr. C.D  Ill  1984)   Other than the items that were reduced above as not necessary, the Court finds that Kaufman's time billed was not excessive

## 2. CUSTOMARY FEE.

20.  Under the customary fee standard, a court must consider the amount normally charged for similar work by other local attorneys in the community, not the amount charged in other districts or cities where rates may be higher or lower.  *See Johnson v. Georgia Hwy. Exp., Inc.*, 488 F 2d 714, 718 (5th Cir. 1974); *In re Dawson*, 180 B.R. 478, 483 (Bankr. E.D. Tex. 1994).  In particular, the comparison should be to what other attorneys for a bankruptcy estate receive  The amount that attorneys for a creditor receive is irrelevant.  What a creditor pays its counsel is entirely between the creditor and the attorney.  The creditor does not have to disclose its legal fees, and the court does not have to approve them, unless the creditor seeks to recover its legal costs from estate assets or from the reorganized debtor under a plan.  *In re Anderson Grain Corp.*, 222 B.R. 528, 531-32 (Bankr. N.D. Tex. 1998); *In re Schepps Food Stores, Inc.*, 25 B.C.D. 1400, 1402 (Bankr. S.D. Tex. 1994).  An estate attorney's fees, by contrast, are subject to court review under 11 U.S.C  § 330.

19

21. Here, Kaufman's hourly rate of $225 is equal to the usual rate charged for comparable work by other debtors' attorneys who represent Chapter 11 estates in the Southern District of Texas, Corpus Christi Division. Kaufman's hourly rate of $225 is in addition the contingent fee of 25% that he allegedly contracted for. The Court has not approved nor allowed such a contingency fee in this case. The issue is not presently before the Court. When and if Kaufman seeks an enhancement, the Court will consider the request.

22. Kaufman charged his full rate for travel time, which is not allowed. *See, Guidelines for Attorneys Fee Applications--Reimbursement of Expenses*, ¶(3) (the "*Guidelines*")[4]. An estate may only be charged 50% of the approved fee for travel time. During the period in which Kaufman represented Park Pontiac and Schuehle, he billed 21.8 hours for travel at his full rate of $225, for a total of $4,905.00  Kaufman's billing records through October 13, 1998, fail to divide travel time from actual work time, and the Court finds that the vagueness of the billing records should be interpreted against Kaufman. Moreover, Mrs. Kaufman also billed the same amount of 21.8 hours, which must also be reduced by half. Based on findings below, Mrs. Kaufman's reasonable hourly rate is $95, so she is entitled to compensation in the amount of $1,035.50 for travel time.  Accordingly, a total reduction will be made of $4,905.00 representing the fees requested by Kaufman, and $1,035.50, representing the fees requested by Mrs. Kaufman on an hourly basis for services rendered for travel. Allocating between the two cases results in deductions from the Schuehle case totaling $1,226.25 for Kaufman's travel over-charge and $517.75 for Mrs. Kaufman's travel overcharge. From October 13, 1998, forward,

---

4  The bankruptcy judges of the Southern District of Texas issues the Guidelines on November 25, 1998.  Although a portion of this fee application represents services rendered and expenses incurred prior to that date, the Court finds that the Guidelines apply to the entire fee application.

Kaufman billed 67 hours for travel time. [5] The fees should be further reduced by $8,375.00, representing one- half the amount billed for such travel. Mrs. Kaufman billed 44 hours for travel time after October 13, 1998, at her rate of $105.[6] As found below, the reasonable rate for Mrs. Kaufman is $95 per hour. Accordingly, the fees for her travel should total $2,090.00 (½ of 44 x $95), and fees will therefore be reduced by $2,530.00.

23. A legal assistant's time should be charged to the bankruptcy estate only if a prudent attorney would charge similar time at a similar rate to a sophisticated non-bankruptcy client. *In re Busy Beaver Bldg. Ctrs., Inc.,* 19 F.3d 833, 851-53 (3d Cir. 1994). Mrs. Kaufman's rate of $105 per hour is excessive for the area. The *Guidelines* provide for a maximum reimbursement rate for paralegals of $65 per hour "except in exceptional circumstances." *Guidelines* at ¶(1)(l)(ii). The Court finds that exceptional circumstances exist in this case. Mrs. Kaufman has a law degree and, although not licensed to practice law, should receive a higher hourly rate than other paralegals. The Court finds that a proper billing rate for her services as a paralegal is $95 per hour. For the period through October 13, 1999, Mrs. Kaufman billed a 135.6 hours, which results in a reduction of $1,356.. Allocating between the estates results in a reduction in the Schuehle estate of $678.00. Following October 13, 1999, Mrs. Kaufman billed 433.50 hours. For the period following October 13, 1999, a reduction of $4,335.00 is appropriate.

24. As found above, Ms. Hinojosa and Ms. Tedesco are at most secretaries, and perform services more akin to runners or general office assistants. Such services are not compensable.

---

5. The Court notes that Kaufman itemized his travel time on some trips to San Antonio, indicating 6 hours for round trip travel. Accordingly, for each trip to San Antonio, the Court allotted 6 hours for travel. For other travel, the Court used the amount indicated on the bill or, if no amount was separated, the entire time billed for the travel period.
6. See footnote 4, supra

Accordingly, all fees billed for Ms. Hinojosa and Ms. Tedesco, should be disallowed. Ms.
Hinojosa and Ms. Tedesco's total hours billed are 138.8, resulting in fees of $9,022.00. The
amount of reduction should be reduced to allow for the time deducted in the Park Pontiac case,
$403.00, resulting in a reduction in this case of $8,619.00.

### 3. AMOUNT INVOLVED AND RESULTS OBTAINED.

25. At the time services are performed, the prospect of saving or recovering money for
the estate must outweigh the legal fees themselves. In other words, the attorney should not
consume whatever likely benefit the services will produce. *In re Witts*, 180 B.R. 171, 173
(Bankr. E.D. Tex. 1995); *In re Arnold*, 176 B.R. 13, 15-16 (Bankr. E.D. Tex. 1995). An estate
attorney must engage in a cost-benefit analysis and bill only for those services justifiable in light
of the likely outcome. *In re Matthews*, 154 B.R. 673, 680-81 (Bankr. W.D. Tex. 1993). This
criterion is seldom met when an estate attorney engages in "scorched earth" litigation tactics, *In
re Kendavis Indus. Intern., Inc.*, 91 B.R. 742, 751 (Bankr. N.D. Tex. 1988), or decides to fight
"trench warfare" heedless of the cost, *Matter of Concrete Products, Inc.*, 208 B.R. 1015,
1025-26 (Bankr. S.D. Ga. 1996), or insists on carrying a dispute to "ridiculous extremes."
*Kendavis*, 91 B.R. at 751.

26. Here, other than the reduction for Kaufman's opposition of the Motion to Disqualify
which was made above, none of Kaufman's services fall into this unfortunate mold.

### 4. EXPERIENCE, REPUTATION, AND ABILITY OF THE APPLICANT.

27. Kaufman is an experienced bankruptcy attorney and board certified. This may justify
a higher hourly rate then other bankruptcy attorneys in the community. It is elementary,
however, that an attorney who holds himself or herself out as a specialist in a particular area of
practice must be held to a higher standard. *Transcraft, Inc. v. Galvin, Stalmack, Kirshner &*

*Clark*, 39 F.3d 812, 815 (7th Cir. 1994), *cert. denied*, 514 U.S. 1123 (1995); *see Iannone v. Frederic R. Harris, Inc.*, 941 F. Supp. 403, 410 (S.D.N.Y. 1996). If an estate's attorney wishes a higher rate of payment based upon alleged exceptional skill, the attorney must demonstrate that he or she did in fact use exceptional skill in handling the case. *In re Saunders*, 124 B.R. 234, 238 (Bankr. W.D. Tex. 1991); *see In re Smith*, 48 B.R. 375, 381-82 (Bankr. C.D. Ill. 1984).

28. Here, Kaufman has demonstrated his skill in representing Chapter 11 debtors. However, Kaufman routinely bills for supervising and performing non-attorney services such as typing, sending faxes, and delivering documents to the courthouse for filing . No particular legal skills are necessary for such tasks, let alone exceptional skills. Standards for fee applications are based on the traditional notion of a law practice in which secretarial time is not compensable, but included as part of overhead. An attorney may not get around this policy by doing his own typing or other secretarial or runner work. Kaufman's fees were reduced above by 5% for the same reason, so no further deduction is necessary.

### 5. NOVELTY AND DIFFICULTY OF THE QUESTIONS.

29. This case presented some, but not many, novel or difficult questions, either of bankruptcy law and of state law. The Court finds that this criterion is not particularly meaningful in analysis of the fee application.

### 6. SKILL REQUIRED TO PERFORM THE SERVICES PROPERLY.

30. Overall, this case requires the skill necessary for any other Chapter 11 reorganization. From what has been said earlier, it is clear that Kaufman's possesses such skill and is being compensated therefore. The skill required is not disproportionately larger than for any other Chapter 11 reorganization. The Court disallowed, above, some of the hours charged which were for clerical tasks. No reasonable attorney would charge a sophisticated client for such work,

23

particularly at professional or paraprofessional rates. Such fees must be disallowed, and this Court has done so as noted above. *Matter of U.S. Golf Corp.*, 639 F.2d 1197, 1201-02 (5th Cir. 1981); *In re Witts*, 180 B.R. 171, 173 (Bankr. E.D. Tex. 1995).

### 7. PRECLUSION OF OTHER EMPLOYMENT DUE TO ACCEPTANCE OF THE CASE.

31. Kaufman testified that he had to turn down other employment because of his work on this case, but did not disclose the names and nature of the cases that he had rejected. Of course, time spent on any representation curtails an attorney's ability to undertake other work. This, without more, does not weigh in the attorney's favor when it comes to awarding fees from estate assets. *In re Dawson*, 180 B.R. 478, 482-83 (Bankr. E.D. Tex. 1994). Considering the size of Kaufman's office, representation of any large Chapter 11 estate will undoubtedly preclude other employment to some extent. The Court finds that this factor is not particularly relevant to its analysis.

### 8. CONTINGENT OR FIXED FEE.

32. This Court has already held that it will not consider the issue of Kaufman's alleged contingent fee agreement or any enhancement fee at this time because that issue is not presently before the Court.

### 9. TIME LIMITATIONS IMPOSED BY THE CLIENT OR THE CIRCUMSTANCES.

33. This factor recognizes that some cases require expedited action, shortened schedules, and/or almost daily attention to numerous claims, motions, and proceedings. *In re Smith*, 48 B.R. 375, 381 (Bankr. C.D. Ill. 1981). This Court has been generous in allotting time and extending deadlines. Kaufman does not assert that either the Court or the client imposed undue or onerous time constraints. Thus, this consideration is not particularly relevant in this case. *In re Dawson*, 180 B.R. 478, 483 (Bankr. E.D. Tex. 1994).

24

## 10. Undesirability of the Case.

34. There is nothing in the record to indicate that this case was undesirable in the legal community. *In re Leonard Jed Co.*, 118 B.R. 339, 346 (Bankr. D. Md. 1990). Thus, this factor is also not particularly relevant.

## 11. Nature and Length of the Professional Relationship with the Client.

35. Kaufman's professional relationship with the client began shortly before the filing of the bankruptcy petitions. This factor is of almost no importance in the analysis. *In re Consolidated Bancshares, Inc.*, 49 B.R. 467, 473 (Bankr. N.D. Tex. 1985), *aff'd in part, remanded in part*, 785 F.2d 1249 (5th Cir. 1986); *accord In re Courtois*, 222 B.R. 491, 496 (Bankr. D. Md. 1998); *In re Recoversion Technologies, Inc.*, 216 B.R. 46, 54 (Bankr. N.D. Okla. 1997).

### 12. AWARDS IN SIMILAR CASES

36. Before determining whether the fees requested are reasonable under this last criterion, the Court must first cut back those fees that are unnecessary. *In re Dawson*, 180 B.R. 478, 483-84 (Bankr. E.D. Tex. 1994). When only the fees for necessary services are examined, the Court finds that they do not exceed what is awarded in this District for similar services.

## OTHER REDUCTIONS

37. Kaufman charged $1.00 per page for faxes. The *Guidelines*, ¶(1)(b)(i), allow $.20 per page for faxes. Kaufman billed for 1374 faxes, totaling $1,374.00, through October 13, 1998. That amount should be reduced by 80%, for a total reduction of $1,099.20 for both estates. The amount of reduction attributable to Schuehle is $549.60. Kaufman billed for 4,393 faxes following October 13, 1998, totaling $4,393.00. That amount should be reduced by 80%, for a total deduction of $3,514.40.

38. Kaufman billed $1.00 per page for 211 copies on January 14, 1999. That amount should be reduced by 85% to bring the item in line with Kaufman's other copy charges, resulting in a reduction of $179.35.

39. The *Guidelines*, ¶(2)(a), disallow reimbursement for meals in town. Prior to October 13, 1998, Kaufman billed $340.67 for local meals, which should be subtracted from expenses. Attributing one-half to the Schuehle case results in a reduction of $170.33. After October 13, 1998, Kaufman billed $1,491.93 for local meals, which should also be deducted.

## SUMMARY OF ALLOWANCE OF FEES AND EXPENSES

40. Based upon the foregoing analysis, the Court determines that the following reductions should be made:

a.  the amount of $23,147.94 for unnecessary fees as set out in paragraphs 12, 16, & 28;

b.  the amount of $1,676.25 for fees incurred in opposing disqualification;

c.  the amount of $1,226.25 for Kaufman's over-billed travel time up to 10/13/98;

d.  the amount of $7,537.50 for Kaufman's over-billed travel time after 10/13/98;

e.  the amount of $517.75 for Mrs. Kaufman's over-billed travel time up to 10/13/98;

f.  the amount of $2,530.00 for Mrs. Kaufman's over-billed travel time after 10/13/98;

g.  the amount of $678.00 for reduction of Mrs. Kaufman's hourly rate from $105 to $95 up to 10/13/98;

h.  the amount of $4,335.00 for reduction of Mrs. Kaufman's hourly rate from $105 to $95 after 10/13/98;

i.  the amount of $8,619.00 for deletion of Ms. Hinojosa and Ms. Tedesco's billing;

j.  the amount of $549.60 in fees for faxes up to 10/13/98;

k.  the amount of $3,514.40 in fees for faxes after 10/13/98;

26

l.       the amount of $179.35 for over-billed copies;

m.      the amount of $170.30 for in-town meals up to 10/13/98;

n.      the amount of $1,491.93 for in-town meals after 10/13/98.

In sum, this Court holds that requested fees of $526,033.50, attributable to the Schuehle estate, will be reduced in the amount of $50,267.69. Further, requested expenses of $57,148.84, attributable to the Schuehle estate, will be reduced by $5,905.58.

41. After these reductions, Kaufman's Application is allowed to the extent of $475,765.81 in fees and $51,243.26 in expenses.

## SOURCE OF PAYMENT

42. The issue of Kaufman's use of GMAC's cash collateral is not properly before the Court. Cash collateral may only be used with the permission of the secured creditor, or by Court order, following notice and the opportunity for a hearing. 11 U.S.C. §363(c)(2). No such motion is before the Court and GMAC did not consent to use of its cash collateral.

## HOLD-BACK

43. In addition to the rulings that this Court has already made, the Court believes that hold-back is appropriate, and there is ample case law in support of hold-backs. *In re Hunt*, 196 B.R. 356 (N.D. Tex. 1996); *In re W & W Protection Agency, Inc.*, 200 B.R. 615 (Bankr. S.D. Ohio 1996). The Court has reached this decision because the Second Plan and GMAC's Plan are set for confirmation on September 14, 1999, and the Court believes that Kaufman needs to understand the importance of achieving a tangible, indentifiable and material benefit in this case, i.e., obtaining confirmation of a plan in the first instance, and then effectuating the provisions of the plan so that creditors are paid. A debtor's attorney should not be allowed to

27

run up substantial fees as a strategy to block confirmation of a competing plan. Accordingly, the

Court holds that there will be a hold-back of the allowed fees in the amount of 30%.

It is therefore ORDERED that Colin K. Kaufman's First Interim Fee Application is

allowed subject to the reductions made herein, for a total allowance of $475,765.81 in fees and

$51,243.26 in expenses, subject to the 30% hold-back.

At Corpus Christi, Texas this 13ᵗʰ day of September, 1999

RICHARD S. SCHMIDT
Chief United States Bankruptcy Judge

TRUE COPY I CERTIFY
ATTEST:
MICHAEL N. MILBY, Clerk of Court
By _____
                    Deputy Clerk

28